UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GABRIEL OLIVARES,

                          Petitioner,

   -v-

ROBERT ERCOLE,

                          Respondent.

Case No. 09-CV-4091 (KMK) (GAY)

ORDER ADOPTING
REPORT & RECOMMENDATION

KENNETH M. KARAS, District Judge:

       Petitioner Gabriel Olivares was convicted in Orange County Court in the State of New York, following a jury trial, of one count each of rape in the first degree, sodomy in the first degree, and intimidating a victim or witness in the third degree. *People v. Olivares*, 824 N.Y.S.2d 172, 173 (App. Div. 2006). Petitioner was sentenced to 25-year determinate sentences for both the rape conviction and the sodomy conviction — with the two 25-year terms to run concurrently — and a 1-and-one-third years to 4-years indeterminate sentence on the intimidation conviction, to run consecutive to the 25-year term. (Sentencing Tr. 15.) The conviction and sentence were affirmed by the Second Department on direct appeal, *see Olivares*, 824 N.Y.S.2d at 173, and leave to appeal to the New York Court of Appeals was denied, *see People v. Olivares*, 874 N.E. 2d 758 (N.Y. 2007) (table).

       Proceeding pro se, Petitioner filed a petition for habeas corpus in this Court. The matter was referred to Magistrate Judge Yanthis, who recommended denying the Petition in full. (Dkt. No. 15.) Petitioner submitted objections to Magistrate Judge Yanthis's Report and Recommendation ("R&R"); the objections consists entirely of a plea to this Court that he is innocent of the crimes of which he has been convicted. The Court has considered the objections

and the entire record, and, for the reasons below, concludes that the R&R should be adopted and the Petition should be denied.

## I. Background

### A. Facts

Petitioner's rape convictions arise from events that took place on June 12, 2003. (Resp. Mem. at 3.)  That afternoon, Petitioner, then 27 years-old, was drinking alcohol with a male roommate of his named Magdalino Leiva, when Maria Stocco, one of their two female roommates, arrived home. (*Id.*)  Their fourth roommate, Marta Posada — the eventual rape victim — was the last to arrive home that day. (*Id.*)  Posada was between 55 and 57 years-old at the time. (*Id.* at 305.)

According to Stocco's testimony, at around 6:00 pm, Petitioner started to call for Posada in a "harsh and demanding voice." (Trial Tr. 286.)  Petitioner began shouting at Posada while she was in the bathroom, and then, when Posada came out, Petitioner grabbed her by the arm. (*Id.* at 287.)  Posada escaped into her bedroom and then her bathroom, but Petitioner went into the bathroom and pulled her out into the apartment while Petitioner hit her. (*Id.* at 290.)  Posada was wearing nothing but a bathrobe. (*Id.*)

Petitioner then dragged Posada around the apartment, threw her under the shower, splashed water on her face, until — eventually — he threw Posada, now naked, onto the bed in his bedroom. (*Id.* at 290–92.)  Stocco testified that she witnessed much of this: although Petitioner had locked Stocco in her own bedroom for a short time, he let Stocco out, and Stocco was in Petitioner's bedroom when she saw Petitioner, now also naked, throw himself on top of Posada on his bed. (*Id.* at 293.)  Petitioner forcibly had vaginal sex with Posada, and then he threw Posada onto her stomach and forcibly had anal sex with her. (*Id.*)  Stocco heard Posada

scream "Please don't do it.  Please don't do it," just before Petitioner began sodomizing Posada. (*Id.* at 294.)

Posada emerged from this, in Stocco's description, "unconscious, crying, but not realizing what had happened to her." (*Id.* at 295.)  But Petitioner was not finished with his violent attack.  Rather, he again took Posada into his bedroom, immobilized her on the bed, and forced her to have vaginal sex with him. (*Id.* at 296.)  Finally, Petitioner left the room to have a drink with the male roommate and "laugh[] for what he had done to" Posada. (*Id.* at 297.)

Posada also testified, and her testimony is similar except that Posada did not recall some of the specifics because she testified that she became unconscious once Petitioner climbed on top of her and began penetrating her for the first time. (*Id.* at 379.)  After the beginning of that first attack, she next remembered waking up in his bed, and seeing Stocco in the room. (*Id.* at 380.)  She next remembers being forced into Petitioner's bedroom to be raped again. (*Id.* at 381.)  Posada testified that she "slightly" remembered the final act of rape, with Petitioner on top of her, asphyxiating her and beating her up. (*Id.* at 381.)

In the immediate aftermath of the attack, neither Posada nor Stocco went to a hospital or the police.  Both testified this was out of "fear," because they were afraid of additional violence from Petitioner.[1] (*Id.* at 298 (Stocco); 382 (Posada).)  But soon after the attack, both Posada and Stocco moved out of the apartment. (*Id.* at 299 (Stocco); 384 (Posada).)

In September 2003, approximately three months later, Petitioner went to Stocco's apartment, where he violently attacked her. (*Id.* at 301.)  He grabbed her neck, pushed her, told

---

[1] Moreover, neither woman had the proper immigration status to be eligible to reside and work in the United States, a fact which plausibly could have contributed to their fear of going to the authorities to report the crime. (Trial Tr. 276 (Stocco); 368 (Posada); *see also id.* at 386 (Posada testifying that one reason she did not initially report the attack was "fear for Immigration because I don't have permission to work").)

her he would kill her, and lit her hair on fire until she allowed him into the apartment. (*Id.* at 301–02.) According to Stocco, he told her that he "would let go [of her], but that [the violence] would not end there if [Stocco] didn't stop speaking about what had happened with [Posada]." (*Id.* at 302.) After witnessing this attack, the owners of the apartment in which Stocco was staying took Stocco to the police station, where she reported the events of June 12, 2003 and after. (*Id.* at 303.) Posada then also spoke to the police in early September 2003, and, when she went to the police, she saw that Stocco was "red, and her hair was burned." (*Id.* at 385.)

Several other witnesses corroborated various aspects of the story that Stocco and Posada told. Most notably, the husband and wife who employed Posada testified that during the second week of June 2003, Posada came to work "frightened, distraught, crying," and she had visible bruising. (*Id.* at 407.) The family then began receiving late night phone calls from a Spanish speaker who continued to ask for Posada and who identified himself as "Gabriel." (*Id.* at 413.) A taxi driver who regularly drove Posada to work also testified that she saw "marks of beatings" on Posada's arms and face around June 2003, and also that Posada seemed afraid and told the driver that Posada had been beaten up. (*Id.* at 418–20.) The prosecution did not introduce any forensic evidence of the rape, and there was no photographic evidence of Posada's injuries.

The defense told a different story. Petitioner testified that, on June 12th, 2003, Posada was "having an attack," and Petitioner became "a little upset so [he] smacked — [he] slapped [Posada] in the face twice so she should calm down a little." (*Id.* at 486.) He then put her in the shower to "try to fix" her supposed "drunkenness." (*Id.*) He testified that he never raped her nor had consensual sex with her that night. (*Id.*) Petitioner also testified that he and Posada had been in a romantic relationship and had slept together before June 12. (*Id.*)

4

Regarding the later beating and intimidation of Stocco in September 2003, Petitioner testified that he did have an encounter with Stocco that day at her apartment. (*Id.* at 492.) But, in Petitioner's version, the two had a discussion where Petitioner attempted to "clear up a situation," which, according to Petitioner, related to Stocco's calling Posada's family in Colombia and telling them that Petitioner had beaten Posada and "[a] whole bunch of things." (*Id.* at 492.) Petitioner stated that he then "stood up and grabbed [Stocco] by the neck," but he testified that he did so "[l]ightly, practically"; in other words, he "wasn't squeezing." (*Id.*) Petitioner testified that he did tell Stocco not to get Petitioner in trouble, but he contended that he never said that Stocco should not get the police involved. (*Id.*)

Several other witnesses also testified for the defense. Leiva, the male roommate, testified that he saw Petitioner smack Posada on the face and Petitioner holding her limp body, but he did not see Petitioner actually rape her. (*Id.* at 436.) He also testified that Petitioner and Posada had occasionally slept together and that, after June 12, 2003, Leiva did not see any bruises on Posada's body. (*Id.* at 431–38.) Three additional witnesses who had encountered the two before June 12, 2003 and who were friends with Petitioner testified that they understood Petitioner and Posada to have been romantically involved before the night of the rape. (*Id.* at 439–62.)

B. Prior Proceedings

After deliberating for more than a day, the jury convicted Petitioner of the above-mentioned counts. (*Id.* at 634–35.) Petitioner was sentenced to 25-year determinate sentences for the rape conviction and the sodomy conviction — with the two 25-year terms to run concurrently — and a 1-and-one-third years to 4-years indeterminate sentence on the

intimidation conviction, to run concurrent to the 25-year term.[2] (Sentencing Tr. 15.) At sentencing, Petitioner did not say anything to the court, and his lawyer stated that Petitioner maintained his innocence. (*Id.* at 5–8.) Knowing an appeal would be coming, the trial court stated that he found the testimony of Stocco and Posada "absolutely totally believable." (*Id.* at 12.) The judge continued:

> I want the Appellate Division to know I'm saying this, because they're only reading a record. I sat here and watched these two women testify. . . . The record should be real clear, maybe these women didn't come forth because I don't know that they were legally in this country . . . . And then, I mean, I believe when, in fact, there was a threat again that came up, the record is real clear these women left that apartment within a few days of this incident and tried to avoid all contact with this defendant. Apparently when he was drunk, he was going to rule the roost, and that's reprehensible conduct; that's conduct which I will not permit and I don't believe society needs to permit.

(*Id.* at 13–14.)

Petitioner appealed to the Second Department, and he raised three issues. First, Petitioner contended that he was deprived of his Due Process and Confrontation Clause rights because the trial court precluded him from asking Stocco whether she knew whether Petitioner was circumcised. Second, Petitioner claims he was deprived of his Due Process rights because the trial court denied a request to have a handwriting expert examine Posada's diary, which diary, according to Petitioner, could have established recent fabrications. Third, Petitioner contended that his sentence was unduly excessive. (*See* Resp. Ex. 10.)

The Second Department affirmed. *Olivares*, 824 N.Y.S.2d at 173. First, the Second Department held that the cross-examination issue was "unpreserved for appellate review," but, in

---

[2] For unexplained reasons, Petitioner was resentenced on the rape and sodomy counts to concurrent terms of 25-years with five years of post-release supervision. (Aff. in Opp. 4 n.2.) It is unclear why this was done, but it does not affect the outcome or analysis here.

any event, the trial court "properly limited the defendant's cross-examination." *Id.* Second, the court held that the trial court "properly denied [Defendant's] application to have a handwriting expert examine the victim's diary. Any testimony by a handwriting expert would have been offered solely to impeach the victim's credibility, and the credibility of a witness may not be impeached through extrinsic evidence on matters collateral to the issues in the case." *Id.* Third, "[t]he sentence imposed was not excessive." *Id.* Petitioner was then denied leave to appeal to the Court of Appeals. *Olivares*, 874 N.E.2d at 758.

Petitioner then commenced state post-conviction proceedings by filing a motion under N.Y. C.P.L. § 440.10. He presented two issues for review. First, he contended that trial counsel was ineffective for allegedly failing to make a motion to dismiss at the close of the prosecution's case. Second, he contended that the evidence was insufficient to support his conviction. (Resp. Ex. 102–04.) The trial court denied each claim on two separate grounds. First, both contentions were forfeited because they could have been raised on direct appeal; and second, both contentions failed on the merits, because Petitioner's attorney did make such a motion and because the evidence was sufficient to support the conviction. (Resp. Ex. 138.) Leave to appeal this denial was denied by the Second Department. (Resp. Ex. 140.)

Finally, Petitioner filed this federal petition for habeas corpus, pursuant to 28 U.S.C. § 2254. (Dkt. No. 2.) Petitioner raises five claims, all of which were addressed either on direct appeal or collateral review: First, that he received ineffective assistance; second, that he was improperly denied his right to a handwriting expert; third, he was deprived of his rights under the Confrontation Clause; fourth, that the evidence was insufficient to support his conviction; and fifth, that his sentence was excessive. (Pet. unpaginated p.4) In support of his habeas petition, Petitioner also submitted additional "affidavits" purporting to show that he and Posada had been

7

in a romantic relationship before June 12, 2003, which he says supports his innocence. (Pet'r Mem. of Law at Ex. A.) Petitioner also attached a report from a polygrapher who conducted a three-question polygraph test on him, which report supposedly shows that Petitioner was answering truthfully when he responded to the polygrapher that he had not had sexual contact with Posada against her will on June 12, 2003. (*Id.* at Ex. B.)

Magistrate Judge Yanthis recommended denying the Petition in full. (Dkt. No. 15.) Magistrate Judge Yanthis held that the limited cross-examination issue was procedurally defaulted, because the Second Department held on direct appeal that Petitioner had not properly objected at trial; and Magistrate Judge Yanthis also held that his ineffective assistance and insufficient evidence claims were also procedurally defaulted, because he failed to raise them on direct appeal. (R&R 4–11.) Nor did Petitioner show that a fundamental miscarriage of justice would occur if the claims were not considered, because Petitioner could not make a sufficient showing that he could be actually innocent. (*Id.* at 8–11.) In this inquiry, Magistrate Judge Yanthis considered the polygraph test and held that, as a matter of law, Petitioner may not rely on an allegedly exonerating polygraph to support actual innocence. (*Id.* at 8.) He also noted that the new affidavits — which, as he notes, do not address the assault itself but only the alleged nature of the relationship between Petitioner and Posada — did not allow him to conclude that "that it is more likely than not that no reasonable juror could have found [P]etitioner guilty beyond a reasonable doubt." (*Id.* at 9.)

Finally, Magistrate Judge Yanthis denied the handwriting expert and the excessive sentence claims fully on the merits. With regard to the handwriting expert, Magistrate Judge Yanthis concluded that Petitioner had failed to establish that the exclusion was erroneous under New York law, and even assuming it was, Magistrate Judge Yanthis held that the exclusion did

8

not deprive Petitioner of the right to a fundamentally fair trial.  (*Id.* at 13.)  With regard to the excessive sentence, Magistrate Judge Yanthis held that because Petitioner was sentenced to a term of imprisonment within the permissible statutory range, there was no federal constitutional issue presented.  (*Id.* at 14.)

Petitioner submitted objections, which were handwritten in Spanish and translated by the Court.  (Dkt. No. 20.)  As discussed in further detail below, the objections do not directly address any of the alleged constitutional violations; rather, Petitioner expands at length on his actual innocence claim.  The Court has carefully reviewed the record, and, for the reasons below, the Court finds that Petitioner is not entitled to habeas corpus relief.

## II. Discussion

### A. Standard of Review

When a magistrate judge has issued a report and recommendation, the district court "may accept, reject, or modify [it], in whole or in part."  28 U.S.C. § 636(b)(1).  The Court reviews de novo any portions of a magistrate judge's report to which a party has timely stated an objection.  *Id.*; *see United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997).  The district court "may adopt those portions of the . . . report [and recommendation] to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law."  *Eisenberg v. New England Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226 (S.D.N.Y.2008) (quoting Fed. R. Civ. P. 72(b)).

Although the district court is obliged to liberally construe the claims articulated in a pro se habeas petition, *see Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), a habeas petitioner still "bears the burden to prove his allegations by a preponderance of the evidence," *Gotti v.*

*United States*, 622 F. Supp. 2d 87, 91 (S.D.N.Y. 2009) (citing *Whitaker v. Meachum*, 123 F.3d 714, 716 (2d Cir. 1997)).

> B. De Novo Review — Petitioner's Actual Innocence Arguments

> > 1. Determining the Nature of the Objections

After a brief discussion of Petitioner's grievances regarding prison life — which the Court and the District Attorney's Office have separately addressed, (*see* Dkt. No. 18) — Petitioner states that he will "try to prove [his] innocence at this moment," (Obj. 3.).[3] What follows is a detailed analysis of the trial transcript as Petitioner sets out to prove that the witnesses who testified against him were lying.

The Court must determine at the threshold, then, what aspects of the R&R Petitioner has actually challenged. That is because Petitioner has not directly presented a free-standing "actual innocence" claim, and, indeed, the Supreme Court "has never expressly held that a petitioner may qualify for habeas relief based solely on a showing of actual innocence." *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012).[4] Instead, the Supreme Court has "recognized that, in rare cases, an assertion of innocence may allow a petitioner to have his accompanying constitutional claims heard despite a procedural bar." *Id.* (emphasis removed) (citing *Schlup v. Delo*, 513 U.S.

---

[3] All citations to the objections are to the translated version, which can be found at Docket number 20.

[4] As the Second Circuit noted in *Rivas*, at least in the capital context, the Supreme Court has hinted at the possibility that a petitioner could be entitled to relief based *solely* on his or her actual innocence. 687 F.3d at 541 (citing *Schlup*, 513 U.S. at 314). To be entitled to relief on a hypothetical "free-standing" actual innocence claim, "the evidence of innocence would have to be strong enough to make the petitioner's execution constitutionally intolerable *even if* his conviction was the product of a fair trial." *Id.* (internal alterations and quotation marks omitted). As described in this Opinion, Petitioner has not even made a "gateway" showing of actual innocence, and thus, even assuming he could state a "free-standing" actual innocence claim in a non-capital case, such a claim would fail.

298, 315 (1995)). Thus, "a petitioner seeking access to a federal habeas court in the face of a procedural obstacle must advance *both* a legitimate constitutional claim *and* a credible and compelling claim of actual innocence." *Id.* (emphasis in original).

Thus, the Court reads Petitioner's objections as directed at Magistrate Judge Yanthis's conclusion that Petitioner has not made a sufficient showing to overcome the procedural bar to reviewing the three claims that Magistrate Judge Yanthis determined were procedurally defaulted: limited cross-examination, ineffective assistance, and insufficient evidence. So construed, the objections do not change the outcome.

### 2. Petitioner's Claim of Actual Innocence

As Magistrate Judge Yanthis properly identified, the standard for reviewing an actual innocence claim was given by the Supreme Court in *Schlup*. That is, to open up an actual innocence "gateway" to review of otherwise-barred constitutional claims, "'the evidence must establish sufficient doubt about [the petitioner's] guilt to justify the conclusion that his [continued punishment] would be a miscarriage of justice *unless* his conviction was the product of a fair trial.'" *Rivas*, 687 F.3d at 541 (quoting *Schlup*, 513 U.S. 316) (emphasis in original). This means that the evidence of innocence must be "'so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Id.* (quoting *Schlup*, 513 U.S. 316).

In *Rivas*, the Second Circuit recently elaborated on that standard:

> To satisfy the *Schlup* standard, a claim of actual innocence must be both "credible" and "compelling." *See House* [*v. Bell*], 547 U.S. [518], 521, 538 [(2006)]. For the claim to be "credible," it must be supported by "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324, *see also House*, 547 U.S. at 537. For the claim to be "compelling," the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable

11

>    juror would find him guilty beyond a reasonable doubt — or to remove
>    the double negative, that more likely than not any reasonable juror would
>    have reasonable doubt." *House*, 547 U.S. at 538.

*Id.* It is that standard by which the Court evaluates Petitioner's actual innocence claims. Petitioner cannot meet this high threshold, as the evidence for his innocence, viewed in light of the entire record, is neither credible nor compelling.

When it comes to why the new evidence is not credible, Magistrate Judge Yanthis got it exactly right. For one thing, "[a] polygraph test is not reliable evidence of actual innocence." *Bower v. Walsh*, 703 F. Supp. 2d 204, 228 (E.D.N.Y. 2010) (citing *Burch v. Millas*, 663 F. Supp. 2d 151, 195–96 (W.D.N.Y. 2009)). *Cf. United States v. Scheffer*, 523 U.S. 303, 310–11 (1998) ("[T]here is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." (citations omitted)). Further, even assuming the results of a polygraph would be admissible, "the probative value would be minimal at best" where the "polygraph examination consisted of three questions." *United States v. Canter*, 338 F. Supp. 2d 460, 464 (S.D.N.Y. 2004). And, in any event, Petitioner testified at his own trial, and in his testimony he denied that he committed the rape. The jury, which had a first-row opportunity to assess his credibility, did not believe him. The result of the polygraph examination thus is not credible new evidence of innocence.

So too with all of Petitioner's other exhibits, which consist of affidavits, transcripts, photocopies of Posada's diary, and — attached to his objections — two photographs of Petitioner, Posada, and others having what appears to be a holiday dinner, plus a hand-drawn diagram of their apartment. (*See* Pet'r Mem. of Law Ex. A–C; Attachments to Obj.) Individually and as a whole, these are a far cry from the type of "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . not presented at trial" that the

Supreme Court said in *Schlup* could be credible evidence of innocence. *Schlup*, 513 U.S. at 324. Instead, what "new" evidence there is — and some of it is not even new — is both unscientific in kind and non-critical in scope: it goes, at best, to the nature of the relationship between Petitioner and Posada or the general credibility of those who testified at trial, but it is entirely silent regarding what happened on June 12, 2003 or September 6, 2003. Moreover, the jury was already told of Petitioner's theories that he and Posada had a pre-existing romantic relationship and that Posada and Stocco were lying, and the jury failed to adopt it, despite the fact that the evidence Petitioner presented at trial is of the same basic type as he still presents, even slightly augmented by Petitioner's new submissions.

Nor is Petitioner's "new" evidence compelling — far from it. Again, all of the evidence is entirely collateral to the questions whether Petitioner raped Posada and whether he subsequently beat and intimidated Stocco. Consider Petitioner's explanation of the hand-drawn diagram of the apartment, which he says proves there was not sufficient space in the apartment for the sleeping arrangements explained in the testimony of Posada and Stocco. (Obj. 10.) In fact, it proves nothing of the sort. Petitioner's diagram reveals that the apartment was a two-bedroom apartment of at least 750 square feet. With a guest allegedly staying with the four roommates for some period of time, it is not difficult to imagine two people in each bedroom and one on the couch in the living room, or one in one of the bedrooms and two in the common space, or frankly any other arrangement of the five. At most, Petitioner's evidence, read in the light that is as favorable as possible, potentially could undermine a few aspects of the testimony of the prosecution's witnesses. But none of it undermines at all the account of June 12, 2003, and its aftermath. Thus, this is not compelling new evidence of his innocence.

The remainder of Petitioner's objections simply ask the Court to believe his account instead of that of Posada, Stocco, and the other prosecution witnesses. Here is one example:

> With respect to the alleged rape of June 12, 2003, it never happened. I did not need to rape her. She slept with me voluntarily and we were having sex like any other couple. Marta and I did have a problem on June 12, 2003, and I slapped her 2 times, and I put her head under the shower because she was acting crazy. I have never denied it because it was the truth but there was no rape.

(Obj. 6.)

Here is an example of Petitioner analyzing and disputing the truth of Posada's trial testimony:

> Please see [Trial Tr. 372–73].
>
> Q. Where did you sleep while your friend was staying from Colombia?
>
> A. In the living room, in [sic] a piece of furniture in the living room.
>
> That is not true. Marta Posada slept with me the whole time. . . .

(Obj. 9.) The remainder of the objections continue in this vein, including extensive quotation from the trial transcript. Construing the objections broadly, they do not provide credible or compelling evidence for actual innocence. Rather, they are just a rehashing of the testimony and argument already presented to the state jury. But "[a] habeas petitioner's contention that a witness' testimony was unworthy of belief is not reviewable in habeas proceedings since credibility determinations are the province of the jury." *Mobley v. Kirkpatrick*, 778 F. Supp. 2d 291, 312 (W.D.N.Y. 2011); *see also United States v. Vasquez*, 267 F.3d 79, 91 (2d Cir. 2001) ("To the extent that any particular witness's testimony was inconsistent, [the petitioner] had an opportunity to highlight these to the jury at trial. The jury chose to believe the witnesses'

testimony despite any inconsistencies. [A federal court] will defer to the jury's assessment of credibility.").

Petitioner, in his objections, makes additional attempts to get this Court to reweigh testimony. (*See* Obj. 11 (arguing that Posada's testimony elsewhere is "not true"); 14 ("I never raped [Posada]. But since she wanted to use me so she would not get deported, she denied everything, and the law always believes women more."); 16 ("Your Honor, do you think that if I had raped [Posada], the victim would come back to visit me with a baby?"); 19 ("Your Honor, I would like for you to analyze this testimony from [Stocco]. Because if it were true that [Stocco] was a witness to a brutal rape on June 12, 2003, she would not have agreed to go to [a third party's] apartment knowing that I was going to be there. Your Honor, are you kidding me?"); 22 ("I would like [Posada and Stocco] to be subjected to a lie detector test to see who is lying and who is telling the truth."); 23 (highlighting an "affidavit" by a third-party stating that "Ms. Marta Posada wants me to testify that Mr. Olivares forced himself into her," though not denying that Petitioner may have actually raped Posada). As stated above, to the extent that these objections are construed as attempting to use actual innocence to overcome the procedural default of certain claims, that attempt fails, because the supposedly new evidence is neither credible nor compelling. And insofar as the objections attempt to state a free-standing actual innocence claim, that claim fails for the same reason, and because weighing testimony is the province of the jury, not a federal habeas court.[5]

---

[5] Petitioner also cites to an alleged pre-trial statement by Posada, though the page numbering is to the trial transcript and that statement does not appear at the listed pages. (Obj. 5–7; 9.) Any objection based on this statement fails for the same reason: Petitioner's citations are merely part of his attempt to show that Posada was lying, based on nothing more than weighing her testimony differently or viewing it in a different light. As explained, Petitioner is not entitled to relief on this ground.

      C. Clear Error Review — The Remainder of the R&R

      The Court finds no clear error in the portions of the R&R to which Petitioner does not object.[6]

      Magistrate Judge Yanthis's conclusions that the cross-examination, ineffective assistance, and insufficient evidence claims are procedurally barred are not clearly erroneous. The governing rule of law is that "[a] claim resolved on independent and adequate state procedural grounds is generally not subject to review on habeas." *Dunn v. Sears*, 561 F. Supp. 2d 444, 452 (S.D.N.Y. 2008) (citing *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991)). As relevant to the limited cross-examination claim, "[i]t is well established that [New York's] contemporaneous objection rule is a firmly established and regularly followed state practice that bars subsequent habeas review" of claims that are not properly objected to and preserved for appeal. *Wilson v. Heath*, No. 11-CV-0827, 2013 WL 1460051, at *10 (N.D.N.Y. Apr. 11, 2013) (citing *Zarvela v. Artuz*, 364 F.3d 415, 418–19 (2d Cir. 2004)). The Second Department clearly held that the objection was unpreserved, and so that procedural bar to habeas review applies. And for the latter two claims, "when a petitioner has failed to bring claims on direct appeal despite a sufficient record, his claims are deemed procedurally defaulted in federal court." *Holguin v. Lee*, No. 13-CV-1492, 2013 WL 3344070, at *4 (S.D.N.Y. July 3, 2013) (citing *Sweet v. Bennett*, 353 F.3d 135, 139–140 (2d Cir. 2003)). As Magistrate Judge Yanthis explained, the New York post-conviction review court held that both claims should have been brought on direct appeal, and so that too presents a procedural bar to their review here. And, as already stated,

---

[6] To be clear, as discussed below, even if the Court reviewed the remainder of the R&R de novo, the result would be the same.

Petitioner cannot show cause and prejudice to excuse the default.[7]

Next, Magistrate Judge Yanthis's conclusion on the handwriting expert claim is not clearly erroneous. Ultimately, evidentiary rulings, even if erroneous, are matters of state evidence law, not federal constitutional law — and only errors of the latter type are cognizable on habeas review. *See Crispino v. Allard*, 378 F. Supp. 2d 393, 408 (S.D.N.Y. 2005) ("[I]t is well established that the mere fact that a state court made evidentiary errors, without more, does not provide a basis for habeas relief." (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). Instead, "[e]videntiary rulings erroneously made by a state trial court amount to constitutional error only if such rulings have the effect of depriving the defendant of a fundamentally fair trial." *Howard v. McGinnis*, 632 F. Supp. 2d 253, 270 (W.D.N.Y. 2009) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302–03 (1973)); *see also Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006) ("[H]abeas corpus relief does not lie for errors of state law, and that necessarily includes erroneous evidentiary rulings. . . . If potentially exculpatory evidence was erroneously excluded, [courts] must look to whether the omitted evidence evaluated in the context of the entire record creates a reasonable doubt that did not otherwise exist." (internal quotation marks,

---

[7] Further, the New York state courts denied all three claims on the merits in the alternative, and the Court sees nothing in those decisions that was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *see also Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) ("It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." (internal quotation marks omitted)). In particular, the state court's exclusion of Petitioner's diary does not warrant federal habeas relief. Even assuming it could have been admissible as a prior inconsistent statement, Petitioner does not state *what* in her diary would have been inconsistent with her testimony. Thus, Petitioner has not shown any prejudice from the exclusion, nor how "the omitted evidence evaluated in the context of the entire record creates a reasonable doubt that did not otherwise exist" such that Petitioner would be entitled to habeas relief. *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006) (internal quotation marks and brackets omitted).

citations, and brackets omitted)).  Thus, while it certainly seems as though the ruling here was permissible under New York state law, even if it was not, Petitioner is not entitled to relief, because its exclusion did not have the effect of depriving Petitioner of a fundamentally fair trial.

Finally, Magistrate Judge Yanthis's recommended denial of the excessive sentence claim is not clearly erroneous.  Claims of an unduly harsh sentence do not raise a cognizable federal constitutional issue if the sentence was within the range prescribed by state law.  *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."); *see also Diaz v. Herbert*, 317 F. Supp. 2d 462, 479–80 (S.D.N.Y. 2004) (same); *Gonzalez v. Travis*, 172 F. Supp. 2d 448, 457 (S.D.N.Y. 2001) ("It is well established that, when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as grounds for federal habeas relief." (internal quotation marks omitted)).  The sentences Petitioner received, while the statutory maximum, are not above the New York statutory maximum.  (R&R 14.)

### D.  Appealability

Petitioner may not appeal this order unless "a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1).  A certificate will be granted "if the applicant has made a substantial showing of the denial of a constitutional right."  *Id.* § 2253(c)(2); *see generally United States v. Perez*, 129 F.3d 255, 259-60 (2d Cir. 1997) (discussing the standard for issuing a certificate of appealability).  The Court finds that Petitioner has not met this burden.  Thus, the Court declines to issue a certificate of appealability.

### III.  Conclusion

Having reviewed de novo the claims raised in Petitioner's objections to the R&R, and having reviewed the remainder of the R&R for clear error, the Court finds that none of

Petitioner's claims warrants habeas relief. In addition, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability.

Accordingly, it is hereby

ORDERED that the R & R is ADOPTED; and it is further

ORDERED that the Court declines to issue a certificate of appealability; and it is further

ORDERED that the Petition is DISMISSED; and it is further

ORDERED that the Clerk of the Court is respectfully directed to enter a judgment in favor of Respondent and to close this case.

SO ORDERED.

DATED:   White Plains, New York
         September 27, 2013

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE